Opinion issued August 31, 2005
















In The
Court of Appeals
For The
First District of Texas




NO. 01-03-00049-CV
____________

CHARLES E. FENNER, M.D. AND CAMILLA FENNER, Appellants

V.

SAMSON RESOURCES CO., SAMSON PROPERTIES, INC., SAMSON
PROPERTIES 1982 PRODUCING PROPERTIES, AMERICAN TRADING
AND PRODUCTION CORPORATION, ATAPCO, INC., TEMA OIL & GAS
CO., AND MAGNUM PRODUCING & OPERATING COMPANY, Appellees



 
On Appeal from the 155th District Court
Austin County, Texas
Trial Court Cause No. 98V-090
 

 
 
MEMORANDUM OPINION
          Appellants, Dr. Charles and Camilla Fenner, challenge a take-nothing judgment
rendered against them in their suit against appellees, Samson Resources Co., Samson
Properties, Inc., Samson Properties 1982 Producing Properties (“Samson”), American
Trading and Production Corp., ATAPCO, Inc., TEMA Oil & Gas Co. (“ATAPCO”),
and Magnum Producing & Operating Co. (Magnum) (collectively, the “Lessees”), for
the breach of two contracts, a Plant Site Lease Agreement and an Oil and Gas Lease. 
A jury found that the Lessees did not fail to comply with either lease. The trial court
rendered judgment on the verdict. In two issues, the Fenners contend that they
established breach as a matter of law and that the jury’s findings that the Lessees did
not fail to comply with both leases were against the great weight and preponderance
of the evidence. We affirm.
Factual and Procedural Background
            The Fenners entered into an Oil and Gas Lease with Millican Oil Company
(“Millican”) in May 1973 to allow Millican to explore and produce oil, gas, and other
hydrocarbons on 692 acres of the Fenners’ property in Austin County. The Oil and
Gas Lease further provided for the laying of pipelines and the building of tanks and
other equipment in order to produce, treat, store, and transport the oil, gas, and other
hydrocarbons. In May 1974, the Fenners and Millican entered into a Plant Site Lease
Agreement, which covered approximately five acres within the 692 acres leased under
the Oil and Gas Lease and allowed Millican to construct and operate a gas processing
unit to gather gas from three surrounding wells. Subsequently, in 1974 or 1975,
Millican installed a gas-processing unit on the five-acre tract. 
          In 1979, Millican assigned its entire interest in the Fenners’ property pursuant
to the Plant Site Lease Agreement and Oil and Gas Lease to Alamo Petroleum
Company (“Alamo”), which later changed its name to Amax Petroleum Company
(“Amax”). Thereafter, on November 1, 1982, Amax assigned its entire interest in the
two leases to Samson, which, at that time, was named Tenax Oil and Gas
Corporation. On January 1, 1987, Samson assigned its entire interest in the two
leases to ATAPCO. In 1991, ATAPCO and Magnum entered into a joint cost-sharing
agreement, and, on February 1, 1993, ATAPCO assigned its entire interest in the two
leases to Magnum. 
          In December 1979, the Fenners and Alamo amended the Plant Site Lease
Agreement to extend such agreement until April 30, 1994. Also in 1979, Dr. Fenner
made numerous complaints to Alamo concerning the effect of the oil and gas
operations on the Fenners’ property. Thereafter, on December 26, 1979, the Fenners
and Alamo entered into a settlement agreement, whereby Alamo paid the Fenners
$125,000 and agreed to drill additional wells. In return, the Fenners agreed to release
any and all claims against Alamo.


 During Alamo’s and Amax’s tenure, a large
saltwater disposal pit was used at the gas processing unit on the five-acre plant site
to dispose of saltwater produced from the wells. In July 1982, the Texas Railroad
Commission determined that the pit violated a state environmental statute and ordered
the pit to be closed, causing Amax to close the pit within a month. 
          As noted, the Plant Site Lease Agreement, as amended, provided that it expired
by its own terms on April 30, 1994. Although the Fenners and Magnum did not
execute an extension of the Plant Site Lease Agreement at any time, Magnum
remained on the property and continued its operations after April 30, 1994. 
Concerned about the plant site’s condition, Dr. Fenner took several pictures of the
plant site in May or June of 1995. Dr. Fenner also wrote a letter, dated June 8, 1995,
to the president of Magnum, Avinash Ahuja, in which Dr. Fenner expressed concern
about the “junk everywhere,” such as “[b]arrels, equipment, [and] pipe” on the plant
site. After receiving Dr. Fenner’s letter, Magnum removed these materials.
          In early 1997, Magnum gave the Fenners its notice of intent to cease operations
and, in February 1997, began its clean up of the gas processing unit and the land. 
Magnum made rental payments for use of the facility through April 1997. In July
1997, in an effort to discover buried pipes and flow lines, Dr. Fenner dug trenches
throughout the five-acre plant site. At Dr. Fenner’s request, Magnum removed the
pipe that Fenner’s excavations had unearthed. Meanwhile, in July 1997, Dr. Fenner
also hired Newpark, an environmental consulting firm, to conduct environmental tests
on the property. A July 29, 1997 report from Newpark to Dr. Fenner indicated that
there was contamination on the five-acre plant site. Although Magnum offered to
remediate a portion of the plant site, the Fenners and Magnum were unable to reach
an agreement as to the necessary remediation.
          Thereafter, on October 30, 1998, the Fenners brought suit against ATAPCO
and Magnum


 for nuisance, trespass, conversion, negligence, negligence per se, and
breach of contract, seeking an injunction and damages. The Fenners amended their
petition to add Samson as a defendant on July 28, 2000. 
          At trial, the Fenners proceeded solely on their claims that the Lessees had
breached the Plant Site Lease Agreement and the Oil and Gas Lease. After nine days
of testimony and argument, the case was submitted to the jury in broad form
questions. Question Number One asked the jury, “Did any of the following
Defendants fail to comply with the terms of the Plant Site Lease?,”


 to which the jury
answered, “No,” for all three Lessees. Question Number Two asked the jury, “Did
any of the following Defendants fail to comply with the Oil and Gas Lease?,”


 to
which the jury answered, “No,” for all three Lessees. Because the jury found that
none of the Lessees had failed to comply with either agreement, it did not answer the
damages question. On November 26, 2002, the trial court rendered judgment on the
verdict, and, therefore, ordered that the Fenners take nothing in their suit against the
Lessees. The Fenners filed motions for judgment notwithstanding the verdict and for
a new trial, which the trial court denied.
The LeasesThe Fenners’ arguments that the evidence was legally and factually insufficient
to support the jury’s findings that the Lessees did not fail to comply with the Plant
Site Lease Agreement and the Oil and Gas Lease are contingent upon the applicability
of certain lease provisions and the definitions of certain lease terms. None of the
parties argue that the Plant Site Lease Agreement or the Oil and Gas Lease are
ambiguous; they simply disagree over the construction and interpretation of certain
terms. 
          The primary concern of a court in construing a written contract is to ascertain
the true intent of the parties as expressed in the instrument. Nat’l Union Fire Ins. Co.
v. CBI Indus., Inc., 907 S.W.2d 517, 520 (Tex. 1995). To achieve this objective,
courts should examine and consider the entire writing in an effort to harmonize and
give effect to all the provisions of the contract so that none will be rendered
meaningless. Coker v. Coker, 650 S.W.2d 391, 393 (Tex. 1983). We presume that
the parties to a contract intend every clause to have some effect. Heritage Res., Inc.
v. NationsBank, 939 S.W.2d 118, 121 (Tex. 1996). When a term in a conveyance is
not specifically defined, that term should be given its plain, ordinary, and generally-accepted meaning. DeWitt County Elec. Coop., Inc. v. Parks, 1 S.W.3d 96, 101 (Tex.
1999). The rules of contract interpretation require us to give the language in an
agreement its plain grammatical meaning unless to do so would defeat the intent of
the parties. Id. The parties’ interpretations of the contract are irrelevant if the
meaning of the contract is plain from its face. Sun Oil Co. (DE) v. Madeley, 626
S.W.2d 726, 732 (Tex. 1981). In applying the foregoing rules, we may not rewrite
the agreement to mean something that it did not. Natural Gas Clearinghouse v.
Midgard Energy Co., 113 S.W.3d 400, 407 (Tex. App.—Amarillo 2003, pet. denied). 
Plant Site Lease Agreement
          The Fenners contend that the Lessees breached section nine of the Plant Site
Lease Agreement, which provides:
At the termination of this lease, Tenant shall have a period of three (3)
months time within which to remove all of the facilities placed thereon
by Tenant and to generally restore the surface of the land.The Fenners assert that the term “surface” is “not limited to the topmost layer of dirt
and vegetation” and that it “necessarily covers all subsurface layers that are affected
by the plant site operations conducted at the surface.” 
          Neither the Plant Site Lease Agreement nor the court’s charge to the jury
defines the word “surface.” Additionally, none of the parties in their briefing or at
argument directed us to a citation in the record where witnesses were asked whether
the word “surface” was a term that had a technical or customary meaning in the oil
and gas industry. Therefore, we give the term “surface” its plain, ordinary, and
generally-accepted meaning. Furthermore, because the charge included no definition
of the word “surface,” it is assumed that the jurors applied the plain and ordinary
meaning of the word. See Northwestern Nat’l Cas. Co. v. McCoslin, 838 S.W.2d 715,
718 (Tex. App.—Waco 1992, writ denied). We also note that the word “surface” has
been defined as “[t]he upper boundary or top of ground or soil, exposed to the air.”
The [Compact] Oxford English Dictionary 287 (2d ed. 1993).
          The Fenners also assert that the word “restore” means “to return to a former or
normal state” and, at trial, argued that the lease required the Lessees to return the
plant site to its “original condition.” However, we note that if the parties had
intended to require the Lessees to return the surface of the land to its original
condition, then the parties were capable of selecting such language, as exemplified
in an addendum to the Plant Site Lease Agreement that required the Lessees to restore
the surface “to its original condition” after the installation of gathering lines. Section
3(a) of the addendum to the Plant Site Lease Agreement, dated October 24, 1974,
provides that 
Landlord hereby grants to Tenant . . . the right to install a gathering
system and to connect various wells in the field to the plant site lease
facility, such lines to be buried at least 30 inches below the ground along
the routes approved by Landlord that would in Landlord’s opinion cause
the least damage to the use of the surface by Landlord in their ranching
operations. Tenant agrees following the installation of any such
gathering lines to restore the surface of the land to its original
condition.


 
(Emphasis added.) In contrast to the gathering-line provision, section nine imposes
a duty to only “generally restore the surface of the land” upon termination of the lease
and does not contain a requirement that the land be restored to its original condition.
          Accordingly, we conclude that the plain and ordinary language of the
complained-of provision of the Plant Site Lease Agreement required the Lessees to
“generally restore” the upper boundary or top of the ground or soil of the plant site. 
Oil and Gas Lease
          The Fenners also contend that the Lessees breached one specific provision of
section 11 of the Oil and Gas Lease, which provides that, in the event of a partial
assignment, all Lessees are responsible “for all damages to surface and subsurface of
the lands covered hereby.” In their brief, the Fenners additionally point to two other
provisions in section 11 that “specif[y] the liabilities of the parties in the event of an
assignment.”



 
          Partial assignment provision
          Throughout their brief, the Fenners repeatedly argue that the Lessees breached
the “partial assignment” provision of the Oil and Gas Lease, contained in the first
paragraph of section 11, which provides:
Notwithstanding that this lease may be assigned in whole or in part, it
is understood and agreed that in the event of partial assignment hereof,
both the original Lessee and such assignees shall nevertheless be jointly
and severally liable to Lessor, their heirs, successors and assigns for all
damages to surface and subsurface of the lands covered hereby . . . .
(Emphasis added). However, this provision expressly applies only to partial
assignments. Here, the record shows that the Oil and Lease was assigned to each
Lessee from its respective predecessor and that each of the assignment contracts
admitted into evidence provided that such assignments were whole, not partial,
assignments. Because the evidence shows that no partial assignments were made, we
conclude that this provision is not applicable.
          Whole assignment provision
          Next, the Fenners point to the “whole assignment” provision of the second
paragraph of section 11, which provides:
In the event Lessee assigns this lease wholly to others, it shall seek the
prior approval of Lessor, their heirs, successors and heirs. Upon such
assignment of the entire lease by Lessee herein, Lessee herein shall not
be further liable for damages as enumerated herein or any other damages
caused by operations hereunder after the date of such assignment.
 
The Fenners argue that, “since the Fenners never gave their prior approval for any
assignment, this provision of the Lease never became operable.” 
          This provision expressly relieves a lessee of liability for a breach of the Oil and
Gas Lease occurring after the whole assignment of the Oil and Gas Lease to another
party. The Fenners repeatedly argue that the Lessees are responsible for damages to
“the surface and the subsurface” of the land as though they were “partial
assignments”; they do not argue in their motion for new trial or in their briefing to
this Court that their breach-of-contract theory rested upon the failure of each Lessee
to obtain the Fenners’ consent before wholly assigning the Oil and Gas Lease to
another oil company. 
          Surface Damages Clause 
          Finally, the Fenners point to the third paragraph of section 11 of the Oil and
Gas Lease, which provides that “Lessee shall be responsible to Lessor for all damages
to the surface of the lands covered hereby caused by Lessee’s operations hereunder,
and to any loss or injury to livestock.” 
          Here, neither the Oil and Gas Lease nor the court’s charge to the jury defines
the word “surface.” As noted, when a term is not specifically defined, that term
should be given its plain, ordinary, and generally-accepted meaning. See Parks, 1
S.W.3d at 101. Again, the word, “surface,” has been defined as “[t]he upper
boundary or top of ground or soil, exposed to the air.” The [Compact] Oxford
English Dictionary 287 (2d ed. 1993). We note that if the Fenners and the Lessees
had intended to require the Lessees to be responsible for damages to both the surface
and the subsurface of the land when whole assignments are made, the parties were
capable of selecting such language, as exemplified in other provisions in the Oil and
Gas Lease. For example, the “partial assignment” provision in the first paragraph of
section 11 expressly uses the term “subsurface” as part of the damages for which each
assignee of a partial assignment is liable. We have already noted, however, that the
first paragraph of section 11 is not applicable because the record shows that whole
assignments were made to each Lessee. 
          Therefore, we conclude that the plain and ordinary language of the applicable
complained-of provision of the Oil and Gas Lease held the Lessees responsible for
all damages to the upper boundary or top of the ground or soil. 
Custom or Usage in Industry
          We note that the Fenners, in their reply brief, assert that “the undisputed
testimony at trial indicated that it is customary in the industry for a lessee to restore
an area back to the condition it was in before a plant site was there” and that “as
Magnum’s representative acknowledged, it is customary that a lessee would be
responsible for cleaning up any environmental problem even without a specific
contractual agreement.” However, it is well-settled that, in an oil and gas lease, in the
absence of an express or implied provision that the lessee would restore the surface
of the land, a lessee has no implied duty to make such restoration. Warren Petroleum
Corp. v. Monzingo, 304 S.W.2d 362, 362–63 (Tex. 1957); see Ottis v. Haas, 569
S.W.2d 508, 514 (Tex. Civ. App.—Corpus Christi 1978, writ ref’d n.r.e.). Here, the
complained-of lease provisions concern only the “surface” of the land. The pertinent
language of the Plant Site Lease Agreement expressly requires that the Lessees
“generally restore the surface of the land,” and the relevant language of the Oil and
Gas Lease holds the Lessees responsible for “damages to the surface of the lands.” 
As noted, the applicable provisions of the Plant Site Lease Agreement and the Oil and
Gas Lease focus on responsibility for damages to the surface, not the subsurface, of
the land. Therefore, even though some testimony suggested that it might be
customary in the industry to restore the land in some manner, the Lessees were
obligated only to do what the express provisions of the leases required them to do. 
See Warren, 304 S.W.2d at 362–63.
Matter of Law ChallengeIn their second issue, the Fenners argue that the trial court erred in denying
their motion for judgment notwithstanding the verdict because they established that
the Lessees breached the Plant Site Lease Agreement and the Oil and Gas Lease as
a matter of law. 
          A trial court may grant a motion for judgment notwithstanding the verdict if a
directed verdict would have been proper. See Tex. R. Civ. P. 301. We review a trial
court’s denial of a motion for judgment notwithstanding the verdict by the same
standard as we review a legal sufficiency challenge. See Navarette v. Temple Indep.
Sch. Dist., 706 S.W.2d 308, 309 (Tex. 1986). When a party challenges the legal
sufficiency of an adverse finding on an issue as to which he bears the burden of proof,
he must demonstrate on appeal that the evidence conclusively established all vital
facts in support of the issue. Dow Chem. Co. v. Francis, 46 S.W.3d 237, 241 (Tex.
2001); Sterner v. Marathon Oil Co., 767 S.W.2d 686, 690 (Tex. 1990); City of
Pasadena v. Gennedy, 125 S.W.3d 687, 692 (Tex. App.—Houston [1st Dist.] 2003,
pet. denied). In reviewing such a “matter of law challenge,” we must first examine
the record for evidence that supports the challenged finding, ignoring the evidence
to the contrary. Francis, 46 S.W.3d at 241. If no evidence exists to support the
finding, we then examine the entire record to determine if the contrary proposition is
established as a matter of law. Id. We will sustain the point of error only if the
contrary proposition was conclusively established. Id. When presented with legal
and factual sufficiency challenges, as we are in this case, we first review the legal
sufficiency of the evidence. Glover v. Tex. Gen. Indem. Co., 619 S.W.2d 400, 401
(Tex. 1981); In re L.M., 104 S.W.3d 642, 647 (Tex. App.—Houston [1st Dist.] 2003,
no pet.).
          The Fenners argue that “there is no evidence to support the jury’s findings of
no breach” of the Plant Site Lease Agreement and Oil and Gas Lease because “[t]he
evidence . . . that purports to support the jury’s verdict amounts to no more than a
scintilla of evidence when viewed in light of the appropriate standard—the language
of the contract requiring restoration of the property.” The Fenners note that,
“[a]dmittedly, there is evidence in the record raising a fact issue as to the extent of the
contamination on the Fenners’ property and the steps required to remove it”; that “this
dispute does not negate the fact that some additional efforts are needed to restore the
property under the terms of the contractual agreements; and that “[a] dispute about
the extent of a problem or what is required to fix it does [not] equal a dispute about
whether the problem exists to begin with.” The Fenners rely on the same evidence
for both their legal and factual sufficiency challenges regarding the jury’s findings
as to both the Plant Site Lease Agreement and Oil and Gas Lease.


 
          However, contrary to the Fenners’ assertions, in regard to the Plant Site Lease
Agreement, there is ample evidence in the record, as detailed below, that supports the
jury’s implied finding that the Lessees “generally restored the surface of the lands”
upon termination of the Plant Site Lease Agreement. Furthermore, in regard to the
Oil and Gas Lease, the same evidence supports the jury’s implied finding that, as
detailed below, that the Lessees were not responsible for “damages [to] the surface
of the lands” during their respective operations. 
          Rajen Ahuja, Magnum’s corporate representative, testified that Magnum took
the following actions to clean up the plant site: (1) in February 1997, Magnum hauled
away “hot junk pipe,” which is pipe that contains “naturally occurring radioactive
material”; (2) in February 1997, Magnum cleaned, unhooked, loaded, and hauled
away tanks and tank batteries; (3) on March 14, 1997, Magnum sent a crane to haul
away miscellaneous production equipment; (4) by March 1997, “almost all the
equipment [was] gone”; (5) in April 1997, Magnum dug and cut flow lines;
(6) Magnum cut off anything that was protruding above ground to below ground
level; (7) around April 23, 1997, Magnum “flattened the location and piled up the
gravel that Dr. Fenner wanted to be pushed up on one side, so he could use it for his
purposes”; (8) all the pipe that had been on the surface of the land had been removed;
(9) in April 1997, Magnum initially had Dr. Fenner’s permission to leave a furnace
and a salt bath on the property, but those were subsequently removed on July 2, 1997;
(10) by July 2, 1997, only the two cement slabs and a metal shed that Dr. Fenner
requested to remain at the plant site remained; and (11) from October 1997 through
December 1997, as a courtesy to Dr. Fenner, Magnum removed pipe that Fenner had
exposed during Dr. Fenner’s efforts to locate buried pipe. 
          Ahuja further testified that he directed Bradford “Butch” Blezinger, who was
employed by both Magnum and ATAPCO, to take soil samples because Dr. Fenner
had expressed concern about environmental problems. Ahuja sent the samples to be
analyzed by Gemini Laboratory in Corpus Christi, and, after he obtained the test
results, Ahuja determined that no further remediation was necessary. He further
testified that the soil samples that he received during the clean-up process showed
total petroleum hydrocarbon levels below the action levels established by the Texas
Railroad Commission and the Texas Natural Resources Conservation Commission
(“TNRCC”), now called the Texas Commission on Environmental Quality.
          Additionally, Dr. Fenner testified that the land “looked good” before he hired
Newpark on July 21, 1997 to dig trenches to locate buried pipe at the plant site and
to collect soil samples. After Fenner “hired a track hoe to come up and dig up some
places” throughout the plant site in order locate buried pipe, Magnum later removed
the pipe. Furthermore, a letter, dated July 29, 1997, from Newpark to Dr. Fenner
noted that all equipment, with the exception of a pig launcher and a small metal shed,
had been removed from the site. Fenner further testified that he had requested that
Magnum leave a metal shed and only one concrete slab, rather than two slabs, at the
plant site. Fenner admitted that the pig launcher, which he agreed had his name
stamped on it, had never been operated by any of the Lessees and that it had later
been removed. Fenner also testified that, in 2000, when digging trenches, Fenner
discovered the barrels, trash, old signs, a newspaper dated October 1981, and cables
buried beneath the surface of the land. Finally, Fenner admitted that Alamo, one of
the Lessees’ predecessors, had drained and cleaned the salt water pit and then covered
it with dirt in 1982. 
          Furthermore, Blezinger testified in his deposition, which was read to the jury,
that he gauged wells for Magnum and that, in 1997, when Magnum was abandoning
the plant site, he helped “remove all the equipment off the site.” In particular, he
testified that (1) a rental company removed the compressor; (2) surface and
subsurface lines connected to the compressors were removed; (3) sump tanks next to
the compressors were removed from the ground; (4) liquid from the compressors was
hauled away; (5) tank batteries were drained of liquid, cleaned out, and transported
away by truck; (6) separators and their connecting lines were removed; (7) all trash
from a trash pit was removed and hauled away; and (8) all pipes were removed from
the ground, including the pipe that Dr. Fenner had uncovered while digging his own
trenches. Blezinger explained that a bulldozer was used to push gravel into two piles
because Dr. Fenner wanted the gravel saved for future use. Blezinger also testified
that, after Dr. Fenner had dug his trenches, Blezinger noticed that the gravel had been
placed on roads through the Fenners’ pastures and to their house.
          The testimony of the parties’ experts also provided evidence that the Lessees
“generally restored the surface of the land” in that no one testified that the upper
boundary or top of the ground or soil on the plant site required remediation. William
Van Thompson, one of the Fenners’ environmental experts, testified that he did not
believe that the top five feet of soil was contaminated in most places and that,
therefore, the top five feet of soil required no remediation in most places.


 
Furthermore, Brad Snow, an environmental consultant and one of the Lessees’
experts, testified that all the soil samples did not exceed standards established by the
TNRCC and that, therefore, no soil remediation was necessary on the plant site. Snow
also noted that the concentrations of any contaminants on Fenners’ land “are not high
enough that it would affect a person coming into direct contact with those soils.” 
          Thomas Koscelny, who had worked for Samson since 1995 as an
environmental supervisor, testified that there were “no indications of sustained soil
or stressed vegetation” while he was visiting the site in November 2000 and that the
“vegetation quality was very good.” He also testified that there “were no visible
remnants of the pit during his site visit” and that he did not “believe [that] any
remediation is required, other than getting out there and filling in the trenches” that
Fenner had dug in his trenching operations. 
          However, the Fenners assert that “[e]vidence of a failure to comply with the
contracts . . . came from [the Lessees] themselves.” Specifically, the Fenners argue
that the following “admissions” demonstrated a “failure to restore the property as a
matter of law”: (1) at trial, Rajen Ahuja “agree[d] that [his] company, Magnum
Producing, owe[d] Dr. Fenner clean up duty after abandoning the plant site” and
testified that, “when we abandoned, yes, we owed [Dr. Fenner] a clean up”;
(2) Avinash Ahuja, Magnum’s president, in his deposition, agreed that “Magnum is
responsible for cleaning up that property in some manner”; and (3) John McCreary,
who had worked for ATAPCO, testified that it was his “understanding that
[ATAPCO] would return [the property] to the general condition” upon termination,
that ATAPCO would “[g]enerally restore the surface of the land,” and that ATAPCO
was “willing to be bound by the contract.” The Fenners also note that Koscelny
testified that, while viewing a video tape that had been admitted into evidence, the
jury could see the following: (1) “some debris, some trash that was located in Mr.
Fenner’s barn area that was reported to be collected from old trash pits on the former
lease site and there is a, an oil can that, that was in the trash pile”; (2) “some of the
other trash that was found in the pit”; (3) “a piece of newspaper that [he] recovered”
dated October 1981; (4) “glassware was collected”; (5) “two piles of trash and barrels
[were] located in Dr. Fenner’s barn,” (6) “some old drums that [had] been crushed up
and recovered”; and (7) “some lease signs.”
          The Texas Supreme Court has held that “[a] party’s testimonial declarations
that are contrary to his position are quasi-admissions.” Mendoza v. Fid. & Guar. Ins.
Underwriters, Inc., 606 S.W.2d 692, 694 (Tex. 1980). A quasi-admission constitutes
merely “some evidence,” and the weight to be given to such an admission is decided
by a trier of fact. Id. A quasi-admission will be treated as a judicial admission if it
appears that (1) the declaration relied upon was made during the course of a judicial
proceeding; (2) the statement is contrary to the theory of recovery or defense asserted
by the person giving the testimony; (3) the statement is deliberate, clear, and
unequivocal, the hypothesis of mere mistake or slip of the tongue being eliminated;
(4) the giving of conclusive effect to the declaration will be consistent with the public
policy upon which the rule is based; and (5) the statement is not destructive of the
opposing party’s theory of recovery. Id. Here, the statements made by Rajen Ahuja,
Avinash Ahuja, McCreary, and Koscelny were not contrary to the theory of defense
asserted by the Lessees, nor were the statements deliberate, clear, and unequivocal. 
Rather, the record shows that these witnesses testified only to the fact that they were
aware that, as the lessees, pursuant to the contracts, that they had an obligation to
restore the surface of the land to its general condition upon termination of the leases
and that objects were found at the plant site. 
           We note that the evidence to which the Fenners cite in their brief and detail in
their factual-sufficiency argument below relates only to possible damages that are not
at the surface of the land. Rather, the Fenners rely on evidence that shows possible
damage five feet or more beneath the surface of the land. Furthermore, the Fenners
have not directed us to any evidence in the 28-volume reporter’s record that shows
that the upper boundary or top of the ground or soil of the Fenners’ land was not
generally restored by the Lessees or that the Lessees caused compensable damage to
the surface of the land. 
          Viewing the evidence in the light most favorable to the verdict, we hold there
is probative evidence sufficient to support the jury’s findings that the Lessees did not
fail to comply with the Plant Site Lease Agreement or the Oil and Gas Lease. We
further hold that the Fenners did not conclusively establish that the Lessees breached
the Plant Site Lease Agreement or the Oil and Gas Lease as a matter of law. 
          We overrule the Fenners’ second issue.Factual Sufficiency ChallengeIn their first issue, the Fenners argue that the jury’s findings that the Lessees
did not fail to comply with the Plant Site Lease Agreement and the Oil and Gas Lease
were against the great weight and preponderance of the evidence because the Lessees
“ignored their express contractual obligations, instead focusing on irrelevant state
regulations and other standards based on evaluating human health and safety risks.” 
          When a party attacks the factual sufficiency of an adverse finding on an issue
on which he has the burden of proof, he must demonstrate on appeal that the adverse
finding is against the great weight and preponderance of the evidence. Francis, 46
S.W.3d at 242. In reviewing a factual sufficiency point, we consider all the evidence
supporting and contradicting the finding. Plas-Tex, Inc. v. U.S. Steel Corp., 772
S.W.2d 442, 445 (Tex. 1989). We set aside the verdict only if the finding is so
contrary to the overwhelming weight of the evidence as to be clearly wrong and
unjust. Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986). We note that the fact finder
is the sole judge of the credibility of the witnesses and the weight to be given their
testimony. Golden Eagle Archery, Inc. v. Jackson, 116 S.W.3d 757, 761 (Tex. 2003). 
The fact finder may believe one witness and disbelieve another and resolve
inconsistencies in testimony. McGalliard v. Kuhlmann, 722 S.W.2d 694, 697 (Tex.
1986). As an appellate court, we may not substitute our judgment for that of the trier
of fact and determine that we would have weighed the evidence differently or reached
a different conclusion. Honda of Am. Mfg., Inc. v. Norman, 104 S.W.3d 600, 604
(Tex. App.—Houston [1st Dist.] 2003, pet. denied). 
           The Fenners assert that the evidence of the Lessees’ “failure to restore the
property” includes the following: (1) “[t]he Fenners found 51 barrels ‘with gunk
leaking out’ buried along the border of the five acre plant site”; (2) “other debris,
including breaker boxes, corrugated tin, and general garbage, was found in the burial
site”; (3) according to the report of Rex Meyer, who was a soil geologist and an oil
and gas consultant and one of the Fenners’ expert witnesses, “the soils underlying the
former gas plant and associated areas have been contaminated with hydrocarbons”
and were contaminated with “arsenic, barium, chromium and lead common [sic]
referred to as heavy metals,” all of which are associated with oil and gas operations;
(4) “the ‘clean up’ work conducted by Magnum in 1997 included a payment to a
contractor to ‘trench and bury contaminated area inside firewall area with track hoe’”;
(5) Van Thompson, one of the Fenners’ experts, testified that water samples taken
from two monitoring wells in 2000 and 2001 showed significantly elevated levels of
benzene; (6) Dr. Fenner, who was reading from a prepared report that summarized
soil-sample data, testified that “[s]oil samples indicated high levels of benzene at
several different sites, together with samples of 1, 2, 4 trimethyl benzene,
naphthalene, 2 methyl naphthaline, zylene and ethyl benzene, all of which exceed the
standards set by the TNRCC”; and (7) Brad Snow, one the Lessees’ expert witnesses,
testified that he “expect[ed] that there is still some oil in the soil and in the ground
water from the pit.” 
          The Fenners also argue that the “admissions” provided above from Avinash
Ahuja’s deposition testimony, Rajen Ahuja’s trial testimony, McCreary’s trial
testimony, and Koscelny’s testimony, “at the very least . . . constitute a great weight
and preponderance of the evidence that should have resulted in a finding of liability
for breach.” The Fenners assert that the Lessees’ “own expert witnesses also
confirm[ed] the existence of contamination on the property.” Specifically, the
Fenners note that, although Brad Snow, one of the Lessees’ expert witnesses,
“concluded that no soil remediation was required,” he also “acknowledged that
several of the soil samples, for example, had high concentrations of total petroleum
hydrocarbons (TPH) and other hydrocarbons” and that he “agreed that there is still
some contamination on the property.” The Fenners also note that “Snow’s conclusion
was admittedly not based on the contracts; instead it was based solely on Railroad
Commission rules and the Texas Risk Reduction Program adopted by the TNRCC”
and that “there is absolutely nothing in either of the contracts requiring [the Lessees]
to remediate the property to these health and human safety standards.” The Fenners
further note that Lloyd Deuel, the Lessees’ second expert and a research soil chemist,
“acknowledged that even he recommended some remediation at various locations on
the property.” The Fenners assert that Deuel “used a standard for testing soils that
does not even exist in Texas” and “adopted a standard known as ‘29B,’ which he
helped implement for the State of Louisiana.”


 
          Finally, in their reply brief, the Fenners note that “the undisputed testimony at
trial indicated that it is customary in the industry for a lessee to restore an area back
to the condition it was in before a plant site was there,” and that, “[a]s Magnum’s
representative acknowledged, it is customary that a lessee would be responsible for
cleaning up any environmental problem even without a specific contractual
agreement.” The Fenners assert that Van Thomspon “clearly qualified his answer by
stating that the top five feet of the soil is not contaminated ‘in most areas,’ indicating
that it is contaminated in others.” 
          Here, there is factually sufficient evidence to support the jury’s implied
findings that the Lessees “generally restore[d] the surface” of the land, pursuant to the
terms of the Plant Site Lease Agreement, and that the Lessees did not, under the terms
of the Oil and Gas Lease, compensably damage the surface of the lands. As noted
above, Rajen Ahuja testified that Magnum removed and transported away all the
production equipment, cut off any object that was protruding above the ground,
removed all pipe that was on the surface of the land, and removed all the buried pipe
that Dr. Fenner unearthed during his trenching operations. Dr. Fenner testified that
the land “looked good” before he commenced his trenching operations and that the
barrels, trash, and signs were buried in the ground. Newpark’s letter to Dr. Fenner
indicated that all equipment, with the exception of a pig launcher, which was later
removed, had been removed from the plant site. Blezinger testified that Magnum
removed all the production equipment and pipes from the plant site and moved the
gravel into two piles for Fenner’s use. While Van Thompson testified that “there is
contamination in the subsurface,” he also testified that the top five feet of soil at the
plant site required no remediation. Brad Snow testified that no soil remediation was
necessary on the plant site. Koscelny testified that there were no visible remnants of
the saltwater pit during his site visit in November 2000. 
          Again, we note that the fact finder is the sole judge of the credibility of the
witnesses and the weight to be given their testimony, may resolve inconsistencies in
the testimony of a witness, and may accept lay testimony over that of experts. Golden
Eagle Archery, 116 S.W.3d at 761; McGalliard, 722 S.W.2d at 697. We may not
pass upon a witness’s credibility or substitute our judgment for that of the trier of fact,
even if the evidence might clearly support a different result. Maritime Overseas
Corp. v. Ellis, 971 S.W.2d 402, 407 (Tex. 1998) (citing Pool v. Ford Motor Co., 715
S.W.2d 629, 634 (Tex. 1986)). 
          Viewing all of the evidence presented in a neutral light, we cannot say that the
jury’s findings were so contrary to the evidence as to be clearly wrong and unjust. 
Thus, we hold the evidence was factually sufficient to support the jury’s findings that
the Lessees did not fail to comply with the Plant Site Lease Agreement or the Oil and
Gas Lease.
          We overrule the Fenners’ first issue.
 
 
 
 
 
Conclusion
          We affirm the judgment of the trial court. 
 
 
 
                                                                        Terry Jennings
                                                                        Justice
 
Panel consists of Justices Jennings, Hanks, and Mirabal.