**HONDA OF AMERICA MANUFAC-
TURING, INC. and Honda R &
D Co., Ltd., Appellants,**

v.

**Brian NORMAN, Individually and as
Sole Administrator of the Estate of
Karen Leslie Vivienne Norman, De-
ceased, and Mary Norman, Individual-
ly, Appellees.**

**No. 01–00–01263–CV.**

Court of Appeals of Texas,
Houston (1st Dist.).

Feb. 6, 2003.

Rehearing Overruled May 16, 2003.

David W. Holman, Holman & Keeling, P.C., Levon G. Hovnatanian, Martin, Disiere, Jefferson & Wisdom, L.L.P., Houston, David M. Prichard, Jeffrey S. Hawkins, Ryan G. Anderson, Prichard, Hawkins & Young, LLP, San Antonio, for Appellant.

Alton C. Todd, The Law Firm of Alton C. Todd, Friendswood, Warren W. Harris, Bracewell & Patterson, L.L.P., Houston, Otto D. Hewitt, III, Hewitt Law Firm, Alvin, Mark W. Stevens, The Law Office of Mark Stevens, Galveston, for Appellee.

Panel consists of Justices HEDGES, JENNINGS, and KEYES.

## OPINION

EVELYN V. KEYES Justice.

This is a products liability suit. A jury awarded Brian Norman, individually and as sole administrator of the estate of Karen Leslie Vivienne Norman, deceased, and Mary Norman, individually, (the Normans) $65 million in compensatory damages in a suit the Normans brought against Honda of America Manufacturing, Inc. and Honda R & D Co., Ltd., after the Normans' daughter, Karen Norman, drowned in her Honda Civic automobile. The jury found that a design defect in the car's seatbelt was the producing cause of Karen's death.

In five issues, Honda argues (1) the evidence was legally and factually insufficient to prove causation; (2) the evidence was legally and factually insufficient to prove a safer alternative design; (3) the trial court abused its discretion in admitting unqualified and unreliable expert testimony; (4) the trial court abused its discretion in admitting evidence of other incidents; and (5) the evidence was legally and factually insufficient to support the jury's award of "grossly excessive damages, which were influenced by improper motivations." We reverse and render a take-nothing judgment.

### Facts and Procedural Background

#### The Accident

At approximately 2:00 a.m. on December 2, 1992, Karen attempted to back her car up to turn around, and she accidentally backed down a boat ramp into the water in Galveston Bay. Her passenger, Josel Woods, was not wearing a seatbelt and was able to get out of the car by crawling out the passenger side window.[1] After escaping, Woods reached back into the sinking car to get her purse. Woods testified that Karen was calm and did not appear scared. As Woods was swimming to the ramp, she heard Karen say, "Help me. I can't get my seatbelt undone." Woods testified that, after she reached the ramp, she heard Karen yell to her again that she could not get out of her seatbelt.[2]

---

1. The windows were manual crank, not electric.

2. Woods also testified that when she reached the ramp and turned around, all she could see was the top of car and the reflection from the headlights. It is unclear how Karen was able to continue to yell to Woods once the car was submerged.

A dive team located Karen's car at 8:53 a.m. All of the windows were rolled up, including the one Woods testified she had escaped through, and all the doors were closed. Karen's body was found in the back seat. An autopsy revealed Karen's blood-alcohol level was .17.[3]

### The Car

At the time of the accident, Karen's four-door 1991 Honda Civic was equipped with a two-point passive restraint system—an automatic seatbelt that was mechanically drawn up over the shoulder when the door was closed—supplemented with a manual lap belt. The automatic seatbelt fastened itself with no action on behalf of the occupant. Robert Hellmuth, a former National Highway Traffic Safety Administration employee, testified that, in 1990, all cars were required to have either a passive belt system or an air bag. Hellmuth also testified that a two-point passive restraint system was the most expensive seatbelt system in use at the time Karen's car was manufactured.

The shoulder belt on both front seats was attached to a "mouse" that ran along a rail above the door. When the door was closed, the mouse moved from its starting position, near the front of the car, along the length of the door and then part-way down the pillar between the front and back doors, pulling the belt over the shoulder of the driver. When the door was opened or the ignition was turned off, the mouse moved forward, allowing the occupant to get out of the car. The shoulder belt could be manually disengaged by pressing an emergency release button located at the juncture of the belt and the mouse. Like most seatbelts, the shoulder belt was naturally taut across the body, but it was easy to spool out more belt to allow the occu-

pant to lean forward and/or sideways. If the car experienced rapid deceleration (such as that encountered here when the car hit the water) or substantial tilting of the vehicle, however, the belt's emergency locking retractor would engage, preventing spooling of the belt and holding the occupant in her seat.

### The Lawsuit

The Normans sued Honda, alleging that the seatbelt system in Karen's car was defectively designed and prevented her from getting out of the sinking car. The case was retried after the original trial resulted in a hung jury.

The Normans contend that the emergency locking retractor locked as Karen backed down the ramp and that she pulled on the door latch, causing the mouse to move and then stall and the seatbelt to pin her to her seat. Because she was pinned to the seat, Karen was unable to reach the emergency release button located over her left shoulder. The Normans argue that the evidence showed the seatbelt system was defectively designed because (1) the mouse was able to move even when the retractor was locked, allowing the seatbelt to pin an occupant in the seat; (2) the seatbelt, when fully extended, could not be released easily and rapidly by pressing the emergency release button; and (3) the emergency release button was improperly located, in that Honda failed to provide an easy and rapid way to get out of the seatbelt under conditions it knew would occur.

The jury found that Karen was 25% contributorily negligent, awarded Karen's parents $60 million in actual damages, and awarded $5 million to Karen's estate. The trial court reduced the award to $20 million for Karen's mother and $18 million for

3. At the time of the accident, the blood-alcohol legal limit was .10. Act of June 19, 1993, 73rd Leg., R.S., ch. 900, § 1.01, 1993 Tex. Gen. Laws 3696, *amended by* Act of May 28, 1999, 76th Leg., R.S., ch. 234, § 1, 1999 Tex. Gen. Laws 1082 (revising legal limit to .08).

Karen's father, and it denied Honda's motion for remittitur as to the estate.

### Design Defect

■ The Civil Practice and Remedies Code prescribes two elements—a safer alternative design and producing cause—that must be proved, but are not alone sufficient, to establish liability for a defectively designed product. Tex. Civ. Prac. & Rem.Code Ann. § 82.005 (Vernon 1997);[4] *Hernandez v. Tokai Corp.*, 2 S.W.3d 251, 256 (Tex.1999). A claimant not only must meet the proof requirements of the statute but must show, under the common law, that the product was defectively designed so as to be unreasonably dangerous, taking into consideration the utility of the product and the risks involved in its use. *Hernandez*, 2 S.W.3d at 257.

### Evidence of Safer Alternative Design

In its second point of error, Honda argues that the judgment should be reversed because there was insufficient evidence of a safer alternative design to the seatbelt restraint system used in the Honda.

### *Standard of Review*

■ When reviewing the legal sufficiency of the evidence, we consider all of the evidence in the light most favorable to the prevailing party, indulging every reasonable inference in that party's favor. *Associated Indem. Corp. v. CAT Contract-*

*ing, Inc.*, 964 S.W.2d 276, 285–86 (Tex. 1998); *Ned v. E.J. Turner & Co., Inc.*, 11 S.W.3d 407, 408 (Tex.App.-Houston [1st Dist.] 2000, pet. denied). If there is more than a scintilla of evidence to support the finding, we must uphold it. *Associated Indem.*, 964 S.W.2d at 285–86; *Ned*, 11 S.W.3d at 408.

■ We will sustain a factual sufficiency challenge only if, after viewing all the evidence, the evidence is so weak or the verdict so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986). As we examine the evidence, we remain mindful that the jury is the sole judge of a witness's credibility and the weight to be given the testimony. The jury may believe one witness and disbelieve another and resolve inconsistencies in any testimony. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex.1986). This Court cannot substitute its opinion for that of the trier of fact and determine that it would have weighed the evidence differently or reached a different conclusion. *Hollander v. Capon*, 853 S.W.2d 723, 726 (Tex.App.-Houston [1st Dist.] 1993, writ denied).

### *Safer Alternative Design*

■ Honda argues that the Normans failed to meet their threshold statutory burden because they failed to prove there was a safer alternative design to the Hon-

---

4. The statute provides, in relevant part:

(a) In a products liability action in which a claimant alleges a design defect, the burden is on the claimant to prove by a preponderance of the evidence that:
(1) there was a safer alternative design; and
(2) the defect was a producing cause of the personal injury, property damage, or death for which the claimant seeks recovery.
(b) In this section, "safer alternative design" means a product design other than the one actually used that in reasonable probability:
(1) would have prevented or significantly reduced the risk of the claimant's personal injury, property damage, or death without substantially impairing the product's utility; and
(2) was economically and technologically feasible at the time the product left the control of the manufacturer or seller by the application of existing or reasonably achievable scientific knowledge.

da's seatbelt restraint system. To prove a design defect, the Normans had to show, among other things, that (1) there was a safer alternative; (2) the safer alternative would have prevented or significantly reduced the risk of injury, without substantially impairing the product's utility; and (3) the safer alternative was both technologically and economically feasible when the product left the control of the manufacturer. TEX. CIV. PRAC. & REM.CODE ANN. § 82.005(a)-(b); *General Motors Corp. v. Sanchez*, 997 S.W.2d 584, 588 (Tex.1999); *Smith v. Aqua-Flo, Inc.*, 23 S.W.3d 473, 477 (Tex.App.-Houston [1st Dist.] 2000, pet. denied). The Normans had the burden of demonstrating by a preponderance of the evidence that a safer alternative design existed at the relevant time. *Id.* In addition, a plaintiff complaining of a design defect is required to show that "the safety benefits from its proposed design are foreseeably greater than the resulting costs, including any diminished usefulness or diminished safety"—that is, that the alternative design not only would have reduced the risk of harm in the instant case, but also would not, "under other circumstances, impose an equal or greater risk of harm." *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 337 (Tex.1998). Thus, the Normans had to prove that an economically and technologically feasible alternative seat belt and release system was available and would have prevented or significantly reduced the risk of Karen's death without substantially reducing the utility to the "intended users" of the product—namely, all automobile drivers. *See Hernandez*, 2 S.W.3d at 258. If no evidence is offered that a safer design existed, a product is not unreasonably dangerous as a matter of law. *Am. Tobacco Co.*

*v. Grinnell*, 951 S.W.2d 420, 433 (Tex. 1997).

The jury charge read, in part, as follows:

Was there a design defect in the seat belt restraint system at the time it left the possession of Honda that was a producing cause of the occurrence in question?

A "design defect" is a condition of the product that renders it unreasonably dangerous as designed, taking into consideration the utility of the product and the risk involved in its use. For a design defect to exist[,] there must have been a safer alternative design.

"Safer alternative design" means a product design[,] other than the one actually used[,] that in reasonable probability—

1. would have prevented or significantly reduced the risk of the occurrence in question without substantially impairing the product's utility and

2. was economically and technologically feasible at the time the product left the control of Honda acting by and though [sic] its agents and/or employees by the application of existing or reasonably achievable scientific knowledge.

The charge followed the language of section 82.005 and the Texas Pattern Jury Charge. TEX. CIV. PRAC. & REM.CODE ANN. § 82.005; PJC 71.4B.

The Normans elicited testimony from several experts, but only two of these experts commented on alternative designs for the seatbelt.[5] Although they did not agree about the feasibility of the various alternative designs, two of the Normans' experts, Thomas Horton, a mechanical engineer, and Kenneth Ronald Laughery, a

---

5. Dr. Clarence A. Bell, the Normans' mechanical and safety engineer, was critical of Honda's seatbelt design because he believed that, due to the location of the emergency release button, the button was "very difficult to release." However, Bell did not testify concerning safer alternative designs.

human factors expert, testified that there were three potential alternative seatbelt system designs: (1) the mouse could be on a timer; (2) the release button could be located on the hip level, as in Toyota cars; and (3) there could be two release buttons—one near the hip and one over the shoulder.[6]

### (1) Mouse timer

Horton was the only witness who testified about a "mouse timer."[7] Horton testified that his main criticism of the Honda seatbelt system was the tightening of the belt. In the Honda system, the belt could be disengaged by manually pressing an emergency release button located at the juncture of the belt and the mouse on the rail above the door. Horton stated that he would modify the system by using a "timer mechanism." He explained that if the mouse, as it moved from front to rear, did not reach its position within a few seconds, it should be assumed that the mouse was stuck. Instead of the mouse stopping in its place and losing power, as allegedly occurred here, Horton suggested the mouse could have been programmed to reverse direction and return to its forward position, releasing tension on the belt. A timer could have been programmed so that, if the mouse did not travel its entire cycle within a certain period of time, it would reverse and return to its original position. Horton explained that it would have been "simple within the electronics" to have created such a system.

To prove that the mouse timer constituted a safer alternative design to the overhead manual seatbelt release in the Honda, the Normans had to show that (1) a mouse

timer existed or that the scientific knowledge to produce it was reasonably achievable, and (2) a mouse timer was economically and technologically feasible at the time Karen's car left Honda's control. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 82.005(b)(2); *Hernandez*, 2 S.W.3d at 258. On cross-examination, however, Horton admitted that he had never drawn up schematics for a mouse timer system. The Normans argue that Horton testified that this design was feasible. He did not. Instead, he simply answered "yes" to the general question of whether, in his opinion, economically and technologically feasible designs were available at the time Honda manufactured Karen's car. Horton did not identify any such available design, nor did he discuss the economic or technological feasibility of such a hypothetical alternative design.

Nor did Horton give any testimony to support a finding that, considering all relevant risks, his alternative design would be safer than the one employed by Honda in that it would not "under other circumstances impose an equal or greater risk of harm." *Uniroyal*, 977 S.W.2d at 337. Horton further testified that he was not critical of Honda for the location of the emergency release button. In fact, he testified that he was "not going to express [an opinion] in this case" with respect to the location or functioning of Honda's emergency release button.

We conclude, based on the record, that the Normans failed to prove that a timer-controlled mouse was a safer alternative design to the seatbelt system in Karen's Honda.

---

**6.** Honda claimed that the Normans also suggested air bags could have been used. However, there was no expert testimony that air bags were an alternative design at the time. In fact, Horton admitted that there were "solid engineering reasons why small cars, sub-

compacts, didn't have air bags back in that time period."

**7.** Dr. Laughery did not testify regarding this particular potential alternative design.

### (2) Toyota alternative-right hip release only

█ The Normans contend that, because of her small frame,[8] Karen positioned the driver's seat close to the steering wheel, which made it difficult, if not impossible, for her to activate the release button found over her left shoulder on the car frame.

The Normans argue that Kenneth Laughery testified that placing a release button over the left shoulder of the driver was not sufficient. Laughery testified that, before 1991, at the same time the Honda system in Karen's car was designed, Toyota was using a release mechanism in the form of a lever control at the lower right side of the driver that released the emergency locking retractor. The Normans argue that Laughery concluded that Honda could have adopted this as an alternative design, because it was technologically and economically feasible. In fact, Laughery testified as follows:

Q: And from your understanding was it economically and technologically feasible at the time that this product left the control of Honda by the application of existing or reasonably achievable scientific knowledge to have provided this [Toyota-type] alternative design?

A: Yeah. I——well, I know it was technologically feasible because I know it was done already. I don't know what the cost of it was, but at least it was judged to be economically feasible in the sense that it existed in other vehicles.

█ While the use of an alternative design by another manufacturer may establish technological feasibility, we have held that, as a matter of law, it does not establish economic feasibility. *Smith*, 23

S.W.3d at 477; *Jaimes v. Fiesta Mart*, 21 S.W.3d 301, 306 (Tex.App.-Houston [1st Dist.] 1999, pet. denied). The existence of a technological advancement goes to technological feasibility, while the cost of applying that technology to a particular design goes to economic feasibility. *Smith*, 23 S.W.3d at 477. Evidence of use in the marketplace alone is not sufficient to establish economic feasibility under Texas law. *Id.* To establish economic feasibility, the plaintiff must introduce proof of the "cost of incorporating this technology." *Id.* at 478.

The Normans argue that several of the witnesses testified that the Honda seatbelt was the most expensive seatbelt ever produced; therefore, by implication, the Toyota design must have been economically feasible because it was less expensive than the existing Honda design. However, even if the Normans presented more than a scintilla of evidence from which the jury could reasonably have inferred that the Toyota passive-restraint system was technologically and economically feasible, they did not establish that the right hip release would have prevented or significantly reduced the risk of Karen's death without "under other circumstances, impos[ing] an equal or greater risk of harm." *See Uniroyal Goodrich Tire*, 977 S.W.2d at 337. The Normans refer us to two of *Honda's* experts, Terry Thomas, a mechanical engineer and Honda's automobile testing expert, and Masaaki Tanahashi, Honda's chief engineer and seatbelt expert, who both testified that the Toyota system was "an alternative design" to the Honda system. Both then agreed that, although the Toyota system, which has the lever release for the retractor at the console, is not a bad or defective system, Honda decided to use a different system. Tanahashi testi-

---

8. Karen was just under five feet tall.

fied that Honda chose a release mechanism located over the driver's left shoulder, instead of one located by the driver's right hip, to make it easier for third parties outside the vehicle to free trapped drivers—who might be unconscious or immobile—in an emergency. Neither Thomas nor Tanahashi testified that the Toyota right hip release design would have saved more lives than the Honda system.

Horton, the Normans' expert and a mechanical engineer, testified that he had no problem with the location of the Honda release mechanism, and he expressly disavowed any intention to testify that one design was better or worse than the other. And Laughery, the Norman's human factors expert, specifically stated he "didn't give [the Toyota design] as the alternative design."[9] In fact, Laughery preferred Honda's release button's association with the belt and testified that it was appropriate that Honda used a button instead of a lever. He noted that Honda's button was easily accessible to emergency personnel, that there was contrasting red color on Honda's release button, and that when one entered a Honda vehicle, the seatbelt release mechanism was in one's field of vision. In addition, Laughery was impeached with his testimony from an earlier, unrelated proceeding involving a man who had drowned when his seatbelt did not release. The seatbelt system was one of the Toyota design and Laughery had offered his opinion in that case that the Toyota system design was defective.

We conclude, based on the record, that the Normans presented no evidence from which the jury could reasonably find that the Toyota hip-release design would have prevented or significantly reduced the risk

of Karen's death without imposing an equal or greater risk of harm under all relevant circumstances. All of the responsive testimony from the Normans' own expert witness—as from Honda's—was to the contrary. The Normans, therefore, failed to prove that the right-hip release system was a safer alternative than the shoulder-release system in Karen's Honda.

### (3) Two release buttons

Finally, Laughery testified that having two release mechanisms, one over the shoulder and one near the hip, was another possibility. Laughery admitted, however, that he did not know whether his proposed design—which he conceded had never been used in any vehicle—was technologically feasible. When Laughery was asked how it would work, he replied, "That's an engineering question. I don't know the answer to that. I don't have engineering design opinions." Horton, the Norman's engineering expert, explained that having two release mechanisms was not technologically feasible.

We conclude, on the basis of the record, that the Normans failed to prove that a two-release-button design was technologically and economically feasible and thus a safer alternative design.

### No Evidence

The Normans failed to show that the mouse timer, the hip release design used by Toyota, or the two-release-button system existed, were technologically and economically feasible, and were safer under relevant circumstances than the seat belt release system present in the Honda. There was, therefore, no evidence that a reasonably safer alternative design existed for Honda's passive restraint system when

**9.** Honda has challenged the qualifications of Dr. Laughery, a psychiatrist, to testify as an expert on engineering design. Because resolution of this issue is not necessary to our disposition of the case, we express no opinion regarding Laughery's qualifications to testify as an expert on safer alternative engineering designs.

the car was manufactured. Having failed to present such evidence, the Normans failed to carry their threshold statutory burden of proving a safer alternative design. *See* Tex. Civ. Prac. & Rem.Code Ann. § 85.005 (Vernon 1997). We hold that the evidence was legally insufficient to support the jury's finding that there was a design defect in Karen's Honda. *See Grinnell,* 951 S.W.2d at 433.

We sustain Honda's second point of error.

Having determined that the evidence was legally insufficient to support the jury's design defect finding, which is a threshold condition of a finding of liability, we need not address Honda's remaining issues on appeal.

We reverse and render a take-nothing judgment.